STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

10-151

consolidated with

10-152

STATE OF LOUISIANA

VERSUS

J.V.F.

****************

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, DOCKET NOS. 150186-B AND 150187-B
HONORABLE WILLIAM J. BENNETT, DISTRICT JUDGE

****************

JAMES T. GENOVESE
JUDGE

****************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Oswald A. Decuir, and
James T. Genovese, Judges.

AFFIRMED IN PART;
VACATED IN PART.

Peggy J. Sullivan
Louisiana Appellate Project
Post Office Box 2806
Monroe, Louisiana 71207-2806
(318) 387-6124
COUNSEL FOR DEFENDANT/APPELLANT:
     J.V.F.

**Charles A. Riddle, III**
**District Attorney – Twelfth Judicial District**
**Miché Moreau**
**Assistant District Attorney**
**Post Office Box 608**
**Marksville, Louisiana 71351-0608**
**(318) 253-4551**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**GENOVESE, Judge.**

Defendant, J.V.F.,[1] appeals his convictions and sentences on two counts of aggravated rape and one count of attempted aggravated rape, alleging insufficiency of the evidence and excessive sentence. For the following reasons, we affirm Defendant's convictions and sentences on the two counts of aggravated rape and vacate his conviction and sentence on the one count of attempted aggravated rape.

## PROCEDURAL HISTORY

After a jury trial, Defendant was convicted of two counts of aggravated rape, in violation of La.R.S. 14:42, and one count of attempted aggravated rape, in violation of La.R.S. 14:42 and 14:27. The trial court ordered Defendant to serve life imprisonment for each count of aggravated rape and fifty years at hard labor for the attempt. The trial court designated that all three penalties run concurrently with each other and be served without benefit of parole, probation, or suspension of sentence. Defendant appeals.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there are no errors patent.

## ASSIGNMENTS OF ERROR

In his appeal, Defendant assigns two errors: (1) insufficiency of the evidence; and, (2) excessiveness of the sentences.

## FACTS AND DISCUSSION OF THE RECORD

Detective Earnest Desselle, with the Avoyelles Parish Sheriff's Office, was the first witness to testify at trial. Detective Desselle was assigned to Defendant's case

---

[1] In accordance with La.R.S. 46:1844(W), initials are being used to protect the victims' identities.

when R.C. and T.C. filed a complaint that their daughters, J.C., eight years of age, and O.C., six years of age, had possibly been molested. On the date the offenses were reported, another officer, Captain Brandon Horton, responded to an attempted suicide at Defendant's residence in Avoyelles Parish. Detective Desselle also went to Defendant's residence, and medical attention was given to Defendant. Deputy Brent Reason also arrived at Defendant's residence and retrieved Defendant's suicide note as evidence, which read:

> I won't be bothering anyone any longer. I only loved too much. [R.F.] I love you and I don't want to see you hurt anymore. Tell my church I'll miss them[;] it is my fault to love anyone I know. If you really know me and you know I'm only full of love, not hurt [sic] I wouldn't hurt anyone. I love you [R.F.]

After visiting the hospital to request an interview with Defendant, Defendant's stepdaughter, C.J., contacted Detective Desselle and told him that Defendant had also molested her children, K.J., five years of age, and D.J., four years of age. C.J. and her family lived next door to Defendant; T.C. and O.C. had been staying with C.J. and her husband, D.J., Sr., for approximately four months leading up to the complaint.

Detective Desselle stated that, in accordance with procedure, he did not interview the children; instead, he referred them to the Rapides Children's Advocacy Center. Although Detective Desselle was not present in the room, he and the victim coordinator for the Avoyelles Parish District Attorney's Office observed and recorded the interviews from a separate room. The next step in the investigation involved medical examinations of the victims by the Avoyelles Parish Coroner's Office.

Detective Desselle said that he watched all four of the children's interviews at the advocacy center. The oldest child, J.C., reported that her "Paw Paw," Defendant, had repeatedly offered her treats to suck his penis, but that she had always refused.

2

O.C. stated that her Paw Paw, Defendant, would give her treats after putting his "pecker" in her mouth, in her "butt," and in her "pie" (vaginal area). Defendant instructed O.C. not to tell her parents and told her that the "man juice" from his penis would make her run faster. K.J. denied that anything had happened to him, but D.J. reported that "PawPaw," Defendant, had put his "pecker" into his "butt," and it hurt.

Detective Desselle stated that all of the children were examined by Dr. Mayeaux the day following the interviews. Dr. Mayeaux found evidence of sexual abuse on O.C. and D.J. J.C. and O.C. first reported this activity to their aunt, S.R., in Lafayette, but D.J. did not report the offense until the interview at the advocacy center. From the interviews, it appeared that the abuse occurred either in Defendant's house or in his backyard workshop. At the time of trial, Defendant was forty-seven years of age.

On cross-examination, Detective Desselle related that he had first spoken to Defendant's wife, R.F., while Defendant was in the hospital. Detective Desselle asked to speak to Defendant when he was released. During their discussion, R.F. indicated that she was upset about a physical altercation that occurred between Defendant and R.C. early that morning when R.C. and T.C. initially confronted Defendant with the allegations.

Detective Desselle stated that he needed to speak to R.F. again, after the advocacy center interviews, because one of the children reported that R.F. had walked in on one of the sexual encounters between Defendant and D.J. R.F. denied witnessing any such thing.

Six-year-old O.C. was the next witness to testify for the prosecution. O.C. stated that her parents were R.C. and T.C. and that she was staying with her aunt.

3

O.C. said she had a younger brother and an older sister, eight-year-old J.C. O.C. indicated that Defendant had touched her on her bottom and her private part while they were at his house. O.C. said that Defendant had used his hand and his "pecker" to touch her. Defendant asked her to touch his private part with her bottom and her private part. O.C. explained that Defendant's private part went both inside and along the outside of her private part and mouth, and it felt "gooie." Yellow stuff came out of his private part and went into her private part, her mouth, and her bottom. O.C. said that Defendant told her that the yellow stuff would make her stronger and run faster. O.C. added that when she did "everything," Defendant would give her treats such as chips and ice cream. O.C. did not like Defendant.

Eight-year-old J.C. testified as the State's third witness. J.C. is O.C.'s older sister, R.C. and T.C. are her parents, and J.C. has a younger brother. J.C. stated that Defendant had asked to touch her on her "thingy" and her "butt" while she was at his house. J.C. told him, "No," but she never told anyone about this. Defendant also asked J.C. to touch his "thingy" with her mouth, and she gave him the same response.

Dr. L.J. Mayeaux, the coroner for Avoyelles Parish, was the fourth witness for the prosecution. The trial court accepted Dr. Mayeaux as an expert in forensic medicine and family practice. Dr. Mayeaux examined the victims of all instances of sexual abuse in Avoyelles Parish. Dr. Mayeaux testified that the children were all related because T.C. was D.J., Sr.'s sister. Defendant was C.J.'s stepfather.

Dr. Mayeaux stated that he examined D.J. first. D.J. told Dr. Mayeaux that Defendant made him suck Defendant's "pecker," that Defendant also sucked D.J.'s "pecker," and that Defendant had put his "pecker" in D.J.'s "butt" many times, which hurt. D.J. mentioned telling his grandmother that his "butt" hurt. D.J. stated that he

4

stayed with Defendant just about every day because R.F. worked five days a week. Medical examination showed that D.J. had hidden rectal tears and scars at the six o'clock and four o'clock areas. Based on the statements and physical examination, Dr. Mayeaux determined that D.J. had been sexually abused.

Dr. Mayeax also examined K.J. K.J. consistently denied that anything happened to him at Defendant's house, although he stated that he saw Defendant kiss D.J. C.J. reported that K.J.'s behavior had worsened over the two years prior to the examination. Dr. Mayeaux recommended that K.J. be kept from Defendant's household until this case was resolved.

Dr. Mayeaux reported his findings from O.C.'s examination. O.C. told him that Defendant made her suck his "pecker" every time she went to visit and that the grandmother was never there. Defendant would give her candy afterward. Defendant touched her private parts. He would put lotion on them or spit on them before putting his "pecker" in her private parts. O.C. saw the "man juice." It would go into her mouth, and she would swallow it. Defendant also put his "pecker" inside her "butthole," which hurt. T.C. told him that O.C.'s behavior and the quality of her school work had changed drastically. Dr. Mayeaux's physical examination revealed that the hymen had been violated and that there was an old vaginal scar at the six o'clock area. O.C.'s rectum was "somewhat dilated," but there were no tears or lacerations in those areas.

Dr. Mayeaux explained that, as part of his practice, he would assess the credibility of the person making the statements. Dr. Mayeaux stated that the boys were both non-perverse and non-programed. O.C. was a little chatterbox and answered his questions truthfully, giving vivid and correct information. Dr. Mayeaux

5

reported that the vaginal dilation would have been caused by "local penetration over some time" and that the scar would have been caused by trauma. Dr. Mayeaux opined that the tears for both O.C. and D.J. were caused by the force of penetration. O.C.'s vaginal scar and rectal dilation would have both been caused by penetration. Based on his examination of and conversation with O.C., Dr. Mayeaux determined that O.C. had been sexually abused by oral, vaginal, and anal intercourse.

Dr. Mayeaux next discussed his examination of J.C. J.C. reported that Defendant had tried to make her suck his "cock." Although he tried, she stated that Defendant did not make it into her crotch. J.C. further stated that Defendant never touched her, and he never put his "pecker" in her. Defendant would deny her candy when she would not comply, but the boys would share their candy with her. Dr. Mayeaux's report shows that J.C. stated that Defendant "tried to make her suck his cock. He never made it into her mouth, but he did try." J.C. stated that Defendant "was always" taking O.C. and D.J. into the house with him. Dr. Mayeaux's physical examination of J.C. revealed no signs of vaginal or rectal trauma. Dr. Mayeaux found J.C. to be sincere. Overall, Dr. Mayeaux recommended that Defendant be arrested and charges filed against him.

After Dr. Mayeaux, S.R. was called to testify for the State. S.R. was a nurse (LPN), and, before that, she worked as a medical assistant for a pediatric clinic for indigents. S.R. is R.C.'s aunt. R.C. and his family moved in with her while R.C. looked for work. The children had always been close to S.R., so she visited with them while R.C. and T.C. unpacked and settled in. During the course of their conversation, O.C. told her aunt that boys did not have "wieners" because wieners were something that were put on a hotdog; instead, boys had "peckers." When S.R.

6

told O.C. that "pecker" was too strong a word for such a little girl to be using and suggested that O.C. refer to it as a wiener, O.C. replied that Defendant had told her it was a "pecker" and that she used to have to suck on one of them all the time. O.C. further stated that she was glad she went to live with S.R. because she would not have to do that any more.

S.R. testified that, after clarifying who Defendant was, she asked J.C. if she knew anything about what O.C. had said. J.C. did not say much, but O.C. repeated her statement and added that Defendant gave her candy as a reward for the activity. O.C. then asked her aunt not to say anything because she was not supposed to have told anyone and that she would get into trouble. O.C. stated that J.C. never had to do it because she refused when Defendant asked her, "Please." O.C. related that J.C. said she would not do that for all of the candy in the world, so O.C. shared her candy with J.C. O.C. also told S.R. that Defendant had "man juice" and that she would be able to run faster if she drank it.

S.R. said she assured O.C. that she would not get in trouble for telling her. She asked O.C. if it was okay if they went and told R.C. about what had happened, because he needed to know. O.C. became "very scared" and asked if Defendant would know where they were living and if he could find them. After telling O.C. that Defendant would not be able to find her, S.R. had R.C. and the girls sit together and instructed the girls to tell R.C. everything they had told her. After R.C. discussed the matter with the girls and reassured them that they were not in trouble, R.C. asked J.C. why she had not reported what had been happening to her little sister. J.C. said she was scared.

S.R. stated that she did not know Defendant and that she had never met him.

7

At first, she did not know about whom the girls were talking. C.J. and D.J., Sr. are not related to S.R. S.R. related that, when R.C. first heard the news, he was shocked, very upset, and cried.

On cross-examination, S.R. stated that J.C. told her at a later date that O.C. did what Defendant asked all the time and that she thought the boys also did it because they had candy, too. They all shared their candy with J.C. because she would never participate. On redirect examination, S.R. stated that she could guarantee that the girls had not been coached.

Four-year-old D.J. testified that Defendant touched his "pecker" and his "butt." D. J. stated that Defendant touched his "butt" with his private part and that Defendant touched his private part with his "butt." D.J. also stated that Defendant's private part went inside his "butt" and that Defendant would give him candy.

Ms. Shauntell Cooper, the director of the Rapides Children's Advocacy Center, testified that she had interviewed D.J., O.C., J.C., and K.J. More information about Defendant's interaction with D.J. was contained in the transcript of the interview at the Rapides Children's Advocacy Center wherein D.J. stated that he liked Defendant because he gave him anything he wanted. He further stated that Defendant touched him on his "butt," his head, his leg, and his "pecker." D.J. said that he had his pants on when Defendant touched his "butt" and his "pecker," that Defendant sucked on his "pecker" and touched the inside of his "butt" with a marker, and that it hurt. D.J. mentioned that, when this happened, "pooh pooh" got on Defendant's hand and that this activity occurred "lots of times."

Reverend Bobby Cazalot testified as the defense's first witness. Defendant was a member of Reverend Cazalot's church for five years. Defendant was active as a

Sunday school teacher for adults. Reverend Cazalot spent time with Defendant and observed his relationship with K.J. Reverend Cazalot noted that D.J. spent less time at Defendant's residence than K.J. Reverend Cazalot was less familiar with O.C. and J.C., who attended church with Defendant approximately three times. Reverend Cazalot stated that Defendant was well-liked within the church, but that Defendant had some problems in the community outside of the church due to alcoholism. Defendant had been jailed after consuming alcohol and medication together. Reverend Cazalot stated that he had never seen anything improper between Defendant and the children other than a normal relationship.

Defendant's wife, R.F., testified as the second witness for the defense. R.F. stated that her relationship with R.C. and T.C. was occasionally contentious and that she would "fuss" at T.C. because of their behavior toward the children relative to "fussing," "cussing," and hitting. R.F. said that R.C. and T.C. locked the children out of their home. When this would happen, D.J. and K.J. would go to R.F.'s house. R.F. testified that she had never seen Defendant behave inappropriately toward the children and that Defendant loved them.

R.F. explained that, the day she learned of the accusations, C.J. called her at work and informed her that R.C. and T.C. had beaten up Defendant. R.F. called Reverend Cazalot, and he took her home. Defendant was sitting down with blood all over his face when they arrived at R.F.'s home. R.F. called in a complaint to the police department, but the police never responded. Defendant went to the hospital for his injuries. R.F. stated that she spoke with Detective Desselle at the hospital, and she told him that R.C. and T.C. had beaten up Defendant. On a later date, R.F. spoke with Detective Desselle again. On that occasion, when he asked her if she had ever

9

walked in on Defendant being inappropriate with the children, she replied that she had not.

R.F. denied that Defendant tried to commit suicide. She stated that he took a couple of pills because he was in pain, but he was responsive when the ambulance arrived. R.F. acknowledged that Defendant had left a note, but she denied that it contained anything stating that he intended to kill himself.

Defendant was the final witness to testify at trial. Defendant acknowledged that he had been arrested twice for impersonating a police officer by using his firefighter accouterments, i.e., a dashboard light and his badge. Defendant stated that he has taken care of fourteen or fifteen children and that he was still in contact with them. Defendant met R.C. and T.C. through C.J. and D.J., Sr. Defendant claimed that he had seen C.J. beat the children and call them names. Defendant stated that he loved his grandchildren, that he took care of them, and that he felt as though his grandchildren loved him. Defendant also felt that he had a good relationship with C.J. and that she relied on him for advice and car repair.

Defendant asserted that T.C. had been in and out of rehabilitation for drug addiction and that she frequently stopped by his house and asked him to buy her some painkillers. Defendant said that he did not know that he was being accused of rape until he had gotten out of the hospital, when everyone thought he had tried to commit suicide. Defendant then stated that R.C. and T.C. had accused him of rape when they appeared on his doorstep early that morning, that they attacked him, that R.C. hit him, and that T.C. kicked him.

Defendant explained that, hours later, he was still shocked and hurt about the allegations. He wrote his wife a letter of apology and went to bed. Defendant

10

claimed that he would give his life before ever hurting a child and that he only wanted good things for J.C., O.C., K.J., and D.J. Defendant stated that O.C.'s injuries could have come from riding the gate like it was a pony. Defendant theorized that the complaints against him were motivated by revenge because his wife had finally "put her foot down" about T.C. being high, locking the children out of the house, and not taking care of them. R.F. called her ex-husband, from whom C.J. had been renting the property next door, and reported T.C.'s behavior. As a result thereby, R.F.'s ex-husband told T.C. that she could not stay there anymore. Defendant also alleged that C.J. was angry at him because R.F. had arranged for Defendant to inherit her house.

Defendant testified that J.C. had received as many treats as the rest of the children. Defendant described J.C. as being quiet with sudden explosions of ill temper.

On cross-examination, Defendant said that J.C. had a bad attitude, but that O.C. had a good attitude. Defendant did not have any theory as to how D.J. sustained his injuries, but he maintained that O.C. had probably gotten hers from playing on the fence.

Defendant admitted that, in Evergreen, he had activated the red light in his car with the intention of stopping a vehicle and that he pled guilty to impersonating a police officer charge.

**ASSIGNMENT OF ERROR NUMBER ONE**

Defendant argues that "[t]he evidence presented at trial was insufficient to convict [him] of aggravated rape or attempted rape." Defendant complains that there was no DNA evidence introduced at trial and that the victim testimony and physical evidence was insufficient to support his convictions. Defendant contends that his

11

status as a Sunday school teacher made him more credible than the State's witnesses. Defendant asserts that he adequately proved that the allegations against him were motivated by revenge because his relationship with the victims' parents was antagonistic.

The Louisiana Supreme Court has set forth the standard of review for sufficiency of the evidence claims and has determined that the appellate court's function does not include reevaluation of witness credibility:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. It is not the function of an appellate court to assess credibility or re-weigh the evidence.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86 (citations omitted).

Therefore, even though Defendant contends that his status as a Sunday school teacher made him a more credible witness than the children, the factfinder in this case, i.e., the jury, determined otherwise; and, the evidence in the record supports the factfinder's determination. The children's reports of the activities occurring at Defendant's home were consistent with each other and their prior reports. Additionally, each of the three children testifying at trial supported the accounts of the others. Likewise, Dr. Mayeaux, the medical examiner who examined the victims and dealt frequently with this type of case, testified that the children all appeared to be giving truthful reports. Ms. Cooper, the interviewer from the Rapides Children's

12

Advocacy Center, who also had experience in this type of situation, similarly vouched for the children's credibility. Additionally, S.R., the great-aunt of O.C. and J.C., testified that the children first reported the matter to her, that she witnessed the reactions of R.C. and T.C. when they heard about the incidents in question, and that R.C. and T.C. had been upset, shocked, and tearful. Finally, the jury was allowed an opportunity to make personal observations regarding the credibility of the children and Defendant. The jury verdict is amply supported by the evidence in the record.

***Aggravated Rape***:

The record, when viewed in the light most favorable to the prosecution, shows that Defendant engaged in both anal and oral sex with both O.C. and D.J. Additionally, Defendant engaged in vaginal intercourse with O.C. At the time of trial, Defendant was in his late forties, O.C. was six years old, and D.J. was four years old. The medical examinations of both children yielded data consistent with their accounts of the sexual abuse.

Aggravated rape occurs when "anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed . . . [w]hen the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense." La.R.S. 14:42(A)(4).

This court has held that, in sex offense cases, the testimony of the minor victim is sufficient to support the conviction:

> Absent internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony is sufficient to support a defendant's conviction of a sex offense, even where the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. Additionally, this court has affirmed

13

convictions, where the defendant was convicted of a sex offense, based solely on minor victims' testimonies.

*State v. Darbonne*, 01-39, pp. 3-4 (La.App. 3 Cir. 6/6/01), 787 So.2d 576, 579, *writ denied*, 02-533 (La. 1/31/03), 836 So.2d 64 (footnotes omitted). In *Darbonne*, this court found sufficient evidence to support Darbonne's aggravated rape conviction based on the ten-year-old victim's statement that the defendant, "play[ed] with him and st[u]ck his penis in his butt." *Id*. at 582.

In *State v. Viree*, 95-176 (La.App. 3 Cir. 3/6/96), 670 So.2d 733, *writ denied*, 96-885 (La. 9/20/96), 679 So.2d 431, the defendant's ten and eleven-year-old daughters reported that he had sexual intercourse with them both during a weekend visitation. A medical examination supported their allegations. At trial, both girls testified about their individual ordeals and confirmed that they had each witnessed their father's acts toward her sister. The defendant denied the allegations. This court found sufficient evidence to support the aggravated rape conviction.

In *State v. Henry*, 439 So.2d 1242, 1247 (La.App. 5 Cir. 1983), *aff'd*, 449 So.2d 486 (La.1984), the court held that a juvenile victim's testimony, when supported by a medical exam, is sufficient to support a defendant's conviction for aggravated rape:

> The testimony of the young victim, though phrased in childish terminology, was quite explicit on this point, and constitutes direct evidence. That, coupled with the doctor's testimony regarding his findings of a tear in the child's hymen and redness and swelling in the vaginal area, were sufficient for a rational jury to find appellant guilty beyond a reasonable doubt . . . .

Therefore, we find, when the evidence is viewed in the light most favorable to the prosecution, a reasonable finder of fact could have found that the evidence introduced at trial established beyond a reasonable doubt that Defendant raped both

O.C. and D.J., who were both under thirteen years of age at the time of the offense. Accordingly, there was sufficient evidence to support both of Defendant's aggravated rape convictions.

***Attempted Aggravated Rape***:

The record indicates that Defendant tried to have J.C., aged eight at the time of trial, perform oral sex on him. Defendant asked J.C. to put her mouth on his penis and requested her permission to touch her private part and her buttocks. According to J.C., Defendant begged her to do this. He even asked, "Please." Because of her refusal to comply with his request for sex, Defendant denied J.C. the treats (candy) that he gave to the other children. Other than Defendant's verbal attempts at sexual involvement with J.C., the record is noticeably vague and void of any specific details in that regard.

Attempt requires a specific intent to commit a particular crime *plus an act toward accomplishing that offense*; however, acting and preparing are not the same thing:

> A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
>
> B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.

La.R.S. 14:27.

Unequivocally, Defendant's propositioning of J.C. clearly indicated his intent to have sex with her if she was compliant. This determination is supported by his

actions toward O.C. and D.J. Additionally, there is no doubt that this activity

occurred while J.C. was under the age of thirteen because she was eight at the time

of trial. Thus, the remaining issue is whether Defendant actually committed an act

in furtherance of having sex with J.C. Specifically, the crucial issue is whether

propositioning J.C. was sufficient to qualify as an attempt to have sex with her.

The second circuit has explained the difference between acting and preparing:

> Attempt requires both the specific intent to commit a crime and an act for the purpose of, or an "overt act," tending directly toward accomplishment of that crime. Specific intent to commit a crime is an element of an attempted offense. The state has the burden of proving defendant's specific intent to commit the charged crime. Conviction of an attempted offense must rest upon sufficient proof that the offender actively desired to cause the proscribed criminal consequences to follow his act or failure to act and that the offender committed or omitted an act for the purpose and tending directly toward the accomplishing of his object.

> The delineation between mere preparation and an overt act has not been precisely defined. The state supreme court has explained that a defendant's actions which are "mere preparation" and those which may be identified as acts "for the purpose of and tending directly toward" commission of a crime may be understood as existing on a continuum. The distinction between which of a defendant's actions constitute an attempt, and which are mere preparation, is fact specific to each case; the trier of fact must determine where a defendant's actions fall on the continuum.

> An act need not be directly proximate to commission of a crime in order to be properly classified as an overt act. Further, an overt act need not be such that it will result in commission of the crime unless frustrated by extraneous circumstances.

> Louisiana's attempt statute rejects factual impossibility as a defense, stating "it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose." La. R.S. 14:27.

*State v. Prine*, 44,229, pp. 10-11 (La.App. 2 Cir. 5/20/09), 13 So.3d 758, 764, *writ*

*denied*, 09-1361 (La. 2/5/10), 27 So.3d 298 (citations omitted).

The two key elements of an attempt are (1) specific intent to commit the

offense, and (2) an act toward accomplishing that offense. La.R.S. 14:27. Even when viewing the evidence in the record in a light most favorable to the prosecution as to the charge of attempted rape, the second mandatory element is not proven. There was no evidence establishing an act by Defendant toward accomplishing the offense in question. Defendant asked, actually begged, J.C. to engage in illicit sexual activity. The record clearly indicates that Defendant took no further action toward accomplishing his quest for sexual activity with an eight-year-old child. However sickening Defendant's actions were, mere propositioning, without anything further, does not constitute an act toward accomplishing that offense and, therefore, does not constitute an attempt. Though it may constitute another crime, it does not constitute attempted aggravated rape. The State failed to prove an essential element of an attempt, i.e., "an act [by Defendant] for the purpose of and tending directly toward the accomplishing of his object . . . ." La.R.S. 14:27(A). "Mere preparation to commit a crime shall not be sufficient to constitute an attempt . . . ." La.R.S. 14:27(B). Solicitation alone is insufficient. Consequently, Defendant's conviction of attempted aggravated rape is vacated.

### ASSIGNMENT OF ERROR NUMBER TWO

Defendant asserts that "[t]he sentence imposed by the trial court was excessive under the circumstances." Defendant contends that the two life sentences for the aggravated rape convictions and the fifty-year sentence for the attempted aggravated rape conviction, all ordered to run concurrently, are excessive because the penalties are the maximum allowable by law. Defendant points out that there were no allegations that he used force or violence and that the allegations of abuse spanned months rather than years. Moreover, Defendant was a Sunday school teacher and a

17

faithful member of his church. In his motion to reconsider sentence, Defendant suggested that ten-year sentences would have been more appropriate.[2]

This court has previously discussed the standard for reviewing excessive sentence claims:

> [Louisiana Constitution Article] I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.

*State v. Barling*, 00-1241, 01-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331 (citations omitted).

> In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case."

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061 (citations omitted). "[T]he trial judge need not articulate every aggravating and mitigating circumstance outlined in [La.Code Crim.P.] art. 894.1[;] the record must reflect that he adequately considered these

---

[2]The trial court denied this motion without a hearing.

guidelines in particularizing the sentence to the defendant." *State v. Smith*, 433 So.2d 688, 698 (La.1983)(citations omitted).

*Aggravated Rape*:

"Whoever commits the crime of aggravated rape shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence." La.R.S. 14:42(D)(1). Thus, the two sentences imposed for Defendant's aggravated rape convictions were mandatory penalties.

This court has previously determined that life imprisonment for the aggravated rape of a child under thirteen is not excessive. *See State v. J.D.*, 09-995 (La.App. 3 Cir. 3/10/10), 32 So.3d 1072 (citing *State v. H.J.L.*, 08-823 (La.App. 3 Cir. 12/10/08), 999 So.2d 338, *writ denied*, *State ex rel. Lantz v. State*, 09-606 (La. 12/18/09), 23 So.3d 936).

Accordingly, Defendant's life sentences are not constitutionally excessive.

*Attempted Aggravated Rape*:

Considering that this court vacated Defendant's conviction on the charge of attempted aggravated rape, this court need not address the issue of the trial court's fifty-year sentence on that conviction as it has been rendered moot.

## DISPOSITION

Defendant's convictions and sentences for aggravated rape are affirmed. Defendant's conviction and sentence for attempted aggravated rape are vacated.

**AFFIRMED IN PART; VACATED IN PART.**

19